George E. Ott, Appellant; *v.* Virtue C. Sweatman.

*Sale—Conditional sale—Bailment.*

The courts, in determining whether or not a contract is one of bailment, or one of sale with an attempt to retain a lien for the price, do not consider what name the parties have given to the contract, but what is its essential character.

Where an agreement in writing is essentially a contract of sale, and not of bailment, the court will construe it to be a contract of sale, notwithstanding an express stipulation in the agreement that "it is distinctly understood and agreed that this is not a contract of sale, conditional or otherwise."

Where there is an actual bailment, though coupled with the right in the bailee to purchase the goods during the continuance of the bailment, the goods are not liable to an execution against the bailee, but where there

has been a sale, coupled with an attempt on the part of the seller to retain a lien for the price, the goods in the buyer's possession are subject to a levy under an execution against him.

An agreement in writing between a manufacturer and a brewer provided for the erection of an ice machine on foundations to be built by the owner of the brewery, who was to pay the manufacturer a certain sum of money in stipulated installments. There was an express condition that "the title, ownership and possession of said machinery and plant, does not pass until all of the said payments of said sums of money" have been made, "and when the last of the above sums of money have been paid, and not until then," the manufacturer will give the brewer "a bill of sale for the said machinery and plant, the consideration whereof shall be the amount of the above mentioned sums of money." The manufacturer reserved the right to remove and sell the machinery and the plant on default, and to collect the balance due less the proceeds of such sale. It was also stipulated that "it is distinctly understood and agreed that this is not a contract of sale, conditional or otherwise." *Held,* that the contract was a conditional sale and not a bailment, and that the ice plant could not be claimed by the manufacturer as against an execution creditor of the brewer.

Argued Jan. 10, 1895. Appeal, No. 6, July T., 1894, by plaintiff, from judgment of C. P. No. 2, Phila. Co., June T., 1890, No. 212, on a verdict for the defendant. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Sheriff's interpleader. Before JENKINS, J. [3 Dist. R. 573.]

The facts appear by the following opinion of the court below, on a motion for a new trial, by JENKINS, J.:

"This was a feigned issue upon a sheriff's interpleader, founded on an execution issued by Virtue C. Sweatman, the defendant, against Lorenz Leiling, George F. Ott being the claimant. On the trial of the case, it appeared from the evidence produced by the claimant that upon Sept. 21, 1889, he made a written agreement with Lorenz Leiling 'to construct and erect at the brewery of Lorenz Leiling, Queen and Baird streets, Germantown, Philadelphia, the refrigerating machinery and plant' described. The agreement also stated : ' The whole plant to be erected upon foundations and supports furnished by Mr. Lorenz Leiling, and ready to be connected with steam and water connections, and ready to charge with brine and ammonia.' The price was to be $6,000, payable in installments,

beginning Sept. 21, 1889, and ending April 1, 1891; and, 'It is understood that the machinery and refrigerating plant stays the property of George F. Ott until fully paid for.'

"Under this agreement, certain portions of the refrigerating machinery were placed upon Leiling's property, but Ott, fearing that the said agreement was not sufficient to prevent a levy and sale of the machinery, under an execution against Leiling, until the contract price was paid, Ott and Leiling, upon March 12, 1890, and after portions of the machinery had been delivered at the brewery, made another written agreement, whereby it was agreed: 'That the said George F. Ott, for the consideration hereinafter named, will erect at the brewery of the said Lorenz Leiling, Queen and Baird streets,' 'the refrigerating machinery and plant,' describing the machinery. That 'the whole of the above plant is to be erected upon foundations and supports to be built and furnished by said Lorenz Leiling, and to be sufficient for the purpose, and to be approved by said George F. Ott, and ready to be connected with steam and water connections, and ready to charge with brine and ammonia.' That the said plant and machinery should be in good working order on or before April 15, 1890. That Leiling should pay to Ott 'the sum of $500 upon the execution of this agreement, which, with the sum of $500 previously paid, makes the sum of $1,000,' and eight further sums, beginning March 15, 1890, and ending April 1, 1891, 'making in all the sum of $6,000.' That in lieu of the eight payments, Ott would accept 'the notes of Leiling at four months, with interest added at the rate of six per cent per annum for each payment,' and to renew said notes. That 'the express condition of this transaction is such that the title, ownership or possession of said machinery and plant does not pass from said George F. Ott to said Lorenz Leiling until all of the said payments of said sums of money, according to the terms and conditions aforesaid, have been paid in full, and when the last of the above sums of money has been paid, and not until then, the said George F. Ott will execute and deliver to said Lorenz Leiling a bill of sale for said machinery and plant, the consideration whereof shall be the amount of the above mentioned sums of money. The said Lorenz Leiling agrees to keep the said machinery and plant insured in the name of the said George F. Ott, in such company or companies,

for $4,000, as the said George F. Ott shall determine, and such insurance policy or policies shall be held by said George F. Ott until all the covenants of this agreement shall have been complied with, when the said policy shall be assigned to said Leiling. In case of default by the said Lorenz Leiling in the payment of any of said sums as above provided, or of any of his covenants in this agreement, it shall be lawful for said George F. Ott to enter upon said premises, and remove and take away the said machinery and plant, and sell the same at public or private sale, with or without notice to said Lorenz Leiling, and said Lorenz Leiling agrees to pay to said George F. Ott any balance that may be due to George F. Ott of the total amount of the sums above mentioned, after deducting the net proceeds of the said sale as damages and rental for said machinery and plant.' And 'it is distinctly understood and agreed that this is not a contract of sale, conditional or otherwise, and that the whole of the contract between the parties hereto is expressed in this instrument without limitation, modification, reservation, misrepresentation, or misapprehension of any kind.' That Leiling should keep the machinery and plant in good repair without expense or charge to Ott.

"Subsequently to this agreement, the remainder of the refrigerating machinery and plant was delivered at Leiling's brewery, put in place, operated by him, and the sum of $2,000 paid by Leiling to Ott, on account of the purchase money.

"The machinery, while in place in Leiling's brewery, and while it was being operated by him, was levied upon by the sheriff, under the said execution, and sold, and the proceeds paid into court to await the determination of this issue. The trial judge instructed the jury to find a verdict for defendant.

"The claimant has moved for a new trial, assigning as a reason therefor, the binding instructions of the trial judge.

"The question raised by this motion is, did the contracts put in evidence by the claimant, coupled with the actual possession and operation of the machinery by the execution defendant, at the time of the levy, conclude the claimant?

"There are many cases in Pennsylvania in which has been considered the liability of goods to levy and sale by the sheriff, where the claimant has parted with their possession under a contract with the execution defendant, by which the latter has

or may become the owner, the contract preventing or attempting to prevent the title passing with the possession. A careful examination of these cases will show that they may be reduced to two classes, one in which the goods have been bailed to the defendant, with the right in him to purchase them during the continuance of the bailment or at its termination, and the other, in which the goods have been delivered to the defendant, under a contract of sale, and the seller has sought to retain a lien on them for the price. In the former, the goods are not subject to the levy during the existence of the contract of bailment, nor until the title has actually vested in the bailee; in the latter they are subject to the levy so soon as they reach the possession of the purchaser, though no part of the price has been paid. The reason for the distinction is that, in a bailment, by the change of possession, no title to the goods passes, and the necessities of life require that bailments should be allowed and enforced; but where the possession of goods changes, under a contract which is essentially one of sale, the title does pass. though conditionally, and, as to an execution creditor of the buyer, will be held to have passed absolutely, and the seller will not be allowed to enforce the condition, as a lien for the price, because a secret lien on personal property is against public policy. The courts in determining whether or not the contract was one of bailment, or one of sale with an attempt to retain a lien for the price, have not considered what name the parties have given to the contract, but what was its essential character."

The court then recited the facts in the following cases as belonging to the former class: Myers v. Harvey, 2 P. & W. 478; Clark v. Jack, 7 Watts, 375; McCullough v. Porter, 4 W. & S. 177; Lehigh Co. v. Field, 8 W. & S. 232; King v. Humphreys, 10 Pa. 217; Chamberlain v. Smith, 44 Pa. 431; Rowe v. Sharp, 51 Pa. 26; Becker v. Smith, 59 Pa. 469; Crist v. Kleber, 79 Pa. 290; Enlow v. Klein, 79 Pa. 488; Christie's Ap., 85 Pa. 463; Dando v. Foulds, 105 Pa. 74; Edwards's Ap., 105 Pa. 103, and Ditman v. Cottrell, 125 Pa. 606.

And the following, as belonging to the second class: Martin v. Mathiot, 14 S. & R. 214; Jenkins v. Eichelberger, 4 Watts, 121; Pritchett v. Cook, 62 Pa. 193; Haak v. Linderman, 64 Pa. 499; Stadtfelt v. Huntsman, 92 Pa. 53; Brunswick v. Hoo-

ver, 95 Pa. 508; Forrest v. Nelson, 108 Pa. 481; Peek v. Heim, 127 Pa. 500. The Court then continued:

" While the decisions above cited are not all those in which the vexed question in this case has been considered, yet they are fairly representative, and a careful examination of the facts of each will show that our Supreme Court has consistently adhered to the principles announced in Martin v. Mathiot, 14 S. & R. 214, that: ' Possession of personal property is the great mark of ownership; it is almost the only index which the world in general has to look to. But there are exceptions; there are certain necessary and lawful contracts by which the owner parts with the possession, and yet fraud cannot be presumed. Such are the contracts of lending and hiring, both very useful, and without which society could not well exist; it is of the essence of these that the owner should give up the possession for a time. Such, too, are contracts by which an artisan or manufacturer has the possession of materials belonging to another, for the purpose of making them up or repairing them for the owner; no suspicion of fraud can fairly arise, where the transaction is in the usual course of business. But the case is very different where it is intended that the property should be apparently in one, while it is in fact in another; this is out of the usual course of business, unnecessarily and directly tending to the injury of those who are not in the secret.'

" The facts in the cases have not always been free from doubt. They have frequently been left to the determination of the jury under the court's instructions, and inconsistent verdicts have been sustained. But where the contract under which the possession of the goods was obtained has been in writing, or if oral has been clearly defined, the court has determined its effect; and where there has been an actual bailment, though coupled with the right in the bailee to purchase the goods, during the continuance of the bailment, they have been held not to be liable to an execution against the bailee; and where there has been a sale, coupled with an attempt upon the part of the seller to retain a lien for the price, the goods in the buyer's possession have been held subject to a levy under an execution against him; and, in doubtful cases, the court in construing the contract has been governed by the principle that ' possession of personal property is the great mark of ownership.'

"King v. Humphreys, 10 Pa. 217, may at the first reading appear to be opposed to Jenkins v. Eichelberger, 4 Watts 121, and Pritchett v. Cook, 62 Pa. 193, yet the facts of the former case, and therefore the principles governing it, widely differ from the latter two cases. In King v. Humphreys, the rags and shavings were delivered to the manufacturer, to be made into paper. He was to receive for manufacturing the paper the difference between what the rags were worth at the rate of five cents a pound, and what the paper would be worth at the rate of ten cents a pound. He took no risk of the market. Whether or not the transaction was a device to conceal a sale, was submitted to the jury. As appears (p. 218) the court below left it to the jury to say ' whether the rags of Humphreys were delivered to the paper-maker in sale or exchange for paper. In other words, were they to be paid for in paper, either by way of payment or as an exchange of commodities? If so, then the creditor might attach the paper in question.' The court further charged: ' But if the rags and shavings were delivered to the artisan in bags, with the name of Humphreys marked on them, to be worked into paper for Humphreys, in such event, the identical paper made from these materials was not subject to attachment. . . . The creditors might have attached the debt or price of manufacturing the article in the hands of Humphreys, but cannot attach the article itself.' The jury found for Humphreys, thus determining as a fact that a sale or an exchange was not intended.

"In Jenkins v. Eichelberger, supra, and Pritchett v. Cook, supra, the tanners were charged with the price of the hides, assumed the risks of the market as to the sale of the leather, and were charged commissions for selling the leather. They were clearly not cases where the manufacturers were paid for their services, but cases where the sellers of hides sought to retain a lien for their price. In Jenkins v. Eichelberger, 4 Watts, 121, the court said, pp. 121, 122: ' An important, if not a decisive feature of the case is, that the hides were charged at cost, with five per cent commission, and interest after six months. So far the transaction appears distinctly in the garb of a sale, at a profit of five per cent and a credit of six months. The plaintiff would doubtless have been willing to sell without stipulating for a re-sale, provided the purchaser had substituted

cash for it or satisfactory security. What had he principally in view ? Undoubtedly to part with the property at a given profit; to effect which required but an ordinary sale; and the transaction certainly took that shape in the first instance, the ulterior arrangements having respect but to security for the price. Annexed to the principal contract was an accessory agreement, that the hides when tanned should be returned to the plaintiff and re-sold by him, and that the proceeds should be paid to the manufacturer, " the price agreed upon for the hides," as it was aptly but significantly called, together with five per cent for commission and guaranty being first deducted. Now, what was the purpose of all this ? Not to give the plaintiff the rise in the market, for he was to have no interest in it. If it were anything but security for the price of the raw material, what was it ? Not to reserve a further profit in the shape of commission for re-sale and guarantee of solvency, for that was ostensibly to be but compensation for the risk and trouble. But why a commission for selling the plaintiff's goods; and why a guarantee of solvency if the sale were not on account of the party to be secured by it ? The very provision indicates not only that the sale was to be on account of the manufacturer, but that it would otherwise have been at his risk.'

"In Prichett v. Cook, 62 Pa. 193, the court said, p. 197 : ' The hides were either the plaintiff's all the while, notwithstanding they were charged to the defendant and delivered to him, or they were delivered on a sale on credit, and a contract for re-sale when tanned. The plan of the parties was sufficiently disclosed in the contract, as proved by the plaintiff's witness, to have been to give to him the advantage and credit of an owner without the liability as an owner to have it seized by creditors. Had there been nothing of this kind in view, no one would have hesitated a moment in pronouncing the transaction a sale. The hides were charged, the debt or price to bear interest, and when leather was returned it was to be sold by the plaintiffs, charging commissions for sales and guaranty and expenses, and crediting the proceeds to the defendant's account. It would be strange to hear of a man charging interest against his own goods, and more strange to charge commissions for sales and guaranties of sales of them. This, the plaintiff's account, given in evidence, shows was done by them.'

"Crist v. Kleber, 79 Pa. 290, appears, at first sight, antagonized by Brunswick & Balke Co. v. Hoover, 95 Pa. 508.    In the former case, Wilson came into possession of the piano, under an agreement called a 'lease,' but which was actually an agreement of hiring, so that he was a bailee; and though he had the right to purchase the piano, still that right did not convert the bailment into a sale; while, in the latter case, Russell had obtained possession of the billiard tables, under a written agreement, signed by the company, stating that he had ordered the tables of the company at a given price, to be paid in installments, the agreement further providing: 'payment to be secured by first lease and fire insurance on said tables.' The 'lease' was executed after Russell had come into actual possession of the tables, and was, as the agreement stated, made for the purpose of securing to the company the price for which the tables were sold.    The Supreme Court therefore held that the tables were liable to execution on a judgment against Russell.    In deciding the case the court said, p. 512: 'The feeble attempt to prove that the tables were delivered under the lease, and not under the contract, will not avail, for the reason among others, that the two papers must be regarded as one transaction.    Taken together they amount to a sale of the billiard tables upon credit, accompanied with a lease thereof as a security for the payment of the price.    Such a contract, while good between the parties, will not keep creditors at bay. It is worthless as to them.    There is no principle of law better settled in Pennsylvania than that a sale and delivery of personal property, with an agreement that the ownership shall remain in the vendor until the purchase-money is paid, enables creditors of the vendee to seize and sell the same for the payment of his debts. . . . There is not a single element of a bailment in this transaction.    It is immaterial what the parties call it; the law pays little heed to the label; it looks beneath and examines the nature and character of the contract between the parties.'

"Farquhar v. McAlevy, 142 Pa. 233, is almost indentical with Brunswick & Co. v. Hoover, supra, except that in the former case the goods were a saw-mill, engine and boiler, and in the latter billiard tables, but the acts of the parties and the

written contracts produced in evidence are practically the same, and in both cases the court held the transactions to be sales.

" Chamberlain v. Smith, 44 Pa. 431; Rowe v. Sharp, 51 Pa. 26; Enlow v. Klein, 79 Pa. 448, and Ditman v. Cottrell, 125 Pa. 606, are governed by the same principles as Crist v. Kleber, supra. . The possession of the goods in each case was obtained under a bailment.

" In Forrest v. Nelson, 108 Pa. 481, the court, in speaking of Rowe v. Sharp, supra, and Enlow v. Klein, supra, said those cases were on the border, and that in them ' the doctrine of bailment was carried to its extreme limit.' In Stadtfeld v. Huntsman, 92 Pa. 53, the court, in speaking of Enlow v. Klein, supra, said, p. 57 : ' An examination of the facts shows that it was a case of hiring, that $2 per week of the sum paid was for the *use* or hire of the horses. This was an important feature of the case in our consultation, and is referred to now, that it may not be misunderstood hereafter. . . . We will not take one step beyond it. We stop just where it ends.' This last remark is practically repeated in Farquhar v. McAlevy, 142 Pa. 233, 240.

"McCullough v. Porter, 4 W. & S. 177, when contrasted with Peek v. Heim, 127 Pa. 500, shows that goods actually consigned to a factor are not liable to an execution against him; but that, when the form of a consignment is taken to disguise a sale, the form gives way to the substance and the goods are liable to an execution against the purchaser.

" Becker v. Smith, 59 Pa. 469, is analogous to McCullough v. Porter, supra, in that the execution debtor was in possession of the claimant's goods, as his agent, with a power of sale.

" In Christie's Ap., 85 Pa. 463, Dando v. Foulds, 105 Pa. 74, and Edwards's Ap., 105 Pa. 103, the execution debtors obtained possession of the goods as lessees of the real estate on which the goods were placed; the use of the goods being in connection with and as accessory to the use of the real estate. The possession of the goods was therefore held to be bailments. In Haak v. Linderman, 64 Pa. 499, the car was ' sold' to Palm.

" Mr Justice BLACKSTONE defines a bailment to be ' a delivery of goods in trust upon a contract, expressed or implied, that the trust shall be faithfully executed on the part of the bailee :' 2 Bl. Com. 451. Chancellor KENT adopts the defini-

tion with the addition, 'and the goods restored by the bailee as soon as the purpose of the bailment shall be answered:' 2 Kent's Com. 558. Mr. Justice STORY defines a bailment to be 'a delivery of a thing in trust for some special object or purpose, and upon a contract, express or implied, to conform to the object or purpose of the trust:" Story on Bailments, § 2.

"The examples of bailments, given by Mr. Justice BLACKSTONE, are the delivery of cloth to a tailor to make a suit of clothes; goods to a carrier, to convey; to an innkeeper or other person, to keep; to a pawnbroker in pledge; cattle to an agister to graze; and contracts of hiring or borrowing. These examples show the character of the trust referred to in his definition:

"'A sale is a transmutation of property from one man to another in consideration of some price or recompense in value:" 2 Bl. Com. 446. 'A sale is a contract for the transfer of property from one person to another, for a valuable consideration:' 2 Kent's Com. 468.

"The contracts at present under consideration are in writing, and are to be construed by the court. The contract dated Sept. 21, 1889, required the claimant 'to construct and erect at the brewery of Lorenz Leiling,' 'the refrigerating machinery and plant,' 'upon foundations and supports furnished by Mr. Lorenz Leiling, and ready to be connected with steam and water connections,' for which Leiling was to pay $6,000 in installments. It is clear from this language that the 'refrigerating machinery and plant' were to become an integral part of Leiling's brewery. We see no difference, so far as the passing of title is concerned, between a contract to construct a 'refrigerating machinery and plant' in a brewery, and a contract to construct a brewery. The bare walls do not constitute the brewery, but upon their construction they become part of the real estate. The character of the building is only ascertained by the character of the machinery placed in it. And when the machinery, fitting the building to its contemplated purpose, is put in place by the owner of the real estate, the land, building and machinery are considered an entirety as real estate, and are equally bound by the lien of mortgages and judgments, and descend to the heir upon the intestacy of the owner: Gray v. Holdship, 17 S. & R. 413; Christian v. Drips, 28 Pa. 271: Heaton v. Findlay, 12 Pa. 304; Roberts v. Bank, 19 Pa. 71;

Buck's Ap., 2 Penny. 327. The words 'construct and erect' are the usual words employed in a building contract, and we do not recall that it has ever been doubted that they are effective words of sale, to pass the title to the building materials, when erected, from the builder to the owner of the land. The words 'construct and erect' are used evidently in the present contracts with the same meaning as they are used in ordinary building contracts. Such words do not imply that a bailment is being created; neither do the words, 'it is understood that the machinery and refrigerating plant stay the property of George F. Ott until fully paid for.' The latter words rather signify an intention to preserve a lien for the price.

" Upon the argument the learned counsel for the claimant practically admitted that the contract of Sept. 21, 1889, would not sustain his contention. He, however, very strenuously and very ably argued that the contract of March 12, 1890, created a bailment, as to the machinery delivered before and after that date. We, however, do not agree with him. The contract of March 12, 1890, was simply an amplification of that of Sept. 21, 1889, but with no essential difference. It provided that Ott should 'erect' 'the refrigerating machinery and plant' at Leiling's brewery, upon foundations and supports to be built and furnished by Leiling, 'ready to be connected with steam and water connections, for the sum of $6,000, payable in instalments, Ott to take Leiling's notes for part of the price and renew them, the title, ownership or possession of said machinery and plant' not to 'pass from said George F. Ott to said Lorenzo Leiling until all of the said payments have been paid in full,' when, 'and not until then,' the said George F. Ott will execute and deliver to said Lorenzo Leiling a bill of sale for said machinery and plant, the consideration whereof shall be the said $6,000, Leiling to keep the machinery and plant insured in the name of Ott in such companies as Ott shall determine, Ott to hold the policies 'until all the covenants of this agreement shall have been complied with,' when they shall be assigned to Leiling; upon Leiling's default in making payments or in keeping 'any of his covenants,' Ott to have the right to enter the premises and take away the machinery, sell the same at public or private sale, appropriate the proceeds to the contract price, Leiling to pay the deficiency, if any, and the agreement not to be 'a con-

tract of sale.' Though the agreement states that neither 'the title, ownership or possession of the said machinery' should pass to Leiling, its actual possession did pass to him, and it became a part of the machinery used by him in his brewery. This last above-mentioned provision, and that relating to the execution of a bill of sale, are merely the mode adopted to preserve the lien for the price. The provision for insurance was to insure Ott's lien. The provision allowing Ott to enter and take away the machinery and to sell it, was to enforce his lien, and gives him no greater right, except the right to sell without notice to Leiling, than the contract of Sept. 21, 1889, for there is no other way in which the lien could be amicably enforced. Under either contract, if Leiling had refused to allow Ott to remove the machinery, the lien could have been enforced only by an action of replevin or by a bill in equity. The covenant requiring Leiling to pay any deficiency, between the contract price and the amount realized from a sale by Ott, after an entry and retaking possession of the machinery by him, for condition broken, is important in determining whether or not the transaction was a sale. If the machinery had been bailed there would have been no reason for covenanting that the title should not pass, for the goods being Ott's he could have enforced his rights without a covenant. The provision that the agreement should not be considered a 'contract of sale,' is of no effect, for the law ascertains the character of a contract, and we consider that both of the said agreements are contracts of sale. They are almost identical with that in Forrest v. Nelson, 108 Pa. 481, which this court and the Supreme Court held was a contract of sale. The said machinery, therefore, could not be claimed by Ott as against an execution creditor of Leiling, and the trial judge was right in charging the jury to find for the defendant in the issue.

" The rule for a new trial is discharged."

*Error assigned* was instruction for defendant, quoting it.

*Joseph de F. Junkin*, for appellant, cited: Forrest v. Nelson, 108 Pa. 481; Edwards v. Stranghellan, 105 Pa. 103; Enlow v. Klein, 79 Pa. 488; Hamilton v. Billington, 163 Pa. 76.

*J. S. Freemann, John F. Keator* and *O. B. Jenkins* with him, for appellee, cited: Forrest v. Nelson, 108 Pa. 488; Brunswick & Balke Co. v. Hoover, 95 Pa. 508; Dearborn v. Raysor, 132 Pa. 231.

PER CURIAM, Jan. 21, 1895:

The learned trial judge rightly held that the agreements. between Leiling and Ott constituted a conditional sale and not a bailment; and hence there was no error in directing a verdict in favor of the defendant in the issue. All that can be profitably said on the controlling question in the case will be found in the able and exhaustive opinion of the court below on the rule for a new trial. On it we affirm the judgment.